UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Stacie MARKULIN,<br><br>　　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　Defendant. | Civ. No. 2:14-02612 (KM)<br><br>OPINION |

### KEVIN MCNULTY, U.S.D.J.:

Stacie Markulin brings this action under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Title II Disability Insurance Benefits ("DIB"). Markulin alleges that she is unable to engage in substantial gainful activity because she suffers from a liver and blood disorder. (R.[1] 226, ECF No. 10)

For the reasons set forth below, the ALJ's decision is AFFIRMED.

### I.　BACKGROUND

Markulin seeks judicial review of an ALJ's finding that she was not disabled from August 1, 2007, through the date she was last insured, June 30, 2009. Markulin applied for DIB on January 6, 2010, for a period of disability beginning August 1, 2007. (R. 222) Her claims were first denied on August 19, 2010, and again on reconsideration on November 6, 2010. (R. 161–64, 166–68) On November 19, 2010, Markulin filed a request for a hearing. (R. 169–70) On November 22, 2011, a hearing was held, at which Markulin appeared and was

---

[1]　"R." refers to the pages of the administrative record filed by the Commission as part of her answer. (ECF No. 10)

1

represented by counsel. (R. 23) A medical expert, Martin A. Fechner, also appeared and testified at the hearing. (*Id.*) On October 26, 2012, Administrative Law Judge ("ALJ") Joel Friedman denied Markulin's application for DIB. (R. 20–31) On February 19, 2014, the Appeals Council affirmed ALJ Friedman's decision. (R. 1–3) Markulin now appeals that decision.

## II. DISCUSSION

To qualify for Title II DIB benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). A claimant must show that she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A), §1382(a)(3)(A).

### a. Five-Step Process and this Court's Standard of Review

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. Review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

> **Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.
>
> **Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.
>
> **Step 3:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20

2

C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step 4:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the SSA to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual issues, this Court will adhere to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation and citation omitted).

> [I]n evaluating whether substantial evidence supports the ALJ's findings . . . leniency should be shown in establishing the claimant's disability, and . . . the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a

3

> typical suit in a court of record where the adversary system prevails.

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, however, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610–11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Secretary's decision, or it may remand the matter to the Secretary for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007).

Outright reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence which, on the whole, establishes that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221-222; *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000); *see also Bantleon v. Comm'r of Soc. Sec.*, 2010 WL 2802266, at *13 (D.N.J. July 15, 2010). Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart*, 111 F. App'x 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable."). It is also proper to remand where the ALJ's findings are not the product of a complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).

### b. The ALJ's decision

ALJ Friedman concluded that from August 1, 2007, through June 30, 2009, Markulin was not disabled. (R. 23) ALJ Friedman's determinations may be summarized as follows.

At step one, the ALJ determined that Markulin had not engaged in substantial gainful activity since August 1, 2007, her alleged disability onset date. (*Id.* 25)

At step two, the ALJ found that Markulin had the following severe impairments: "liver disease, history of alcohol abuse in remission." (*Id.*)

At step three, the ALJ determined that Markulin's impairments, alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1 (the "Listings"). (R. 25)

The ALJ then found that Markulin had the residual functional capacity ("RFC") to "perform the full range of sedentary work," defined in 20 C.F.R. § 404.1567(a). (*Id.* 26)

At step four, the ALJ determined that, based on her RFC, Markulin was unable to perform any past relevant work. (R. 30) The ALJ found that Markulin's past relevant work included working as a cashier, sandwich maker and sales person. Those jobs "were performed at the light exertional range and are beyond the RFC reached in this decision." (*Id.*) ALJ Friedman also found that Markulin was 46 years old on her alleged disability onset date, which put her in the category of "younger individual age." (*Id.*) The ALJ also found that Markulin "had at least a high school education." (*Id.*) Transferability of job skills was "not material to the determination of disability" because Markulin was not disabled under the Medical-Vocational Rules regardless of transferability of job skills. (*Id.*)

At step five, the ALJ considered Markulin's "age, education, work experience, and residual functional capacity" and the Medical-Vocational Guidlines, and determined that Markulin could perform jobs that exist in

5

significant numbers in the national economy. (*Id.*) As noted above, such a finding at step five requires that benefits be denied.

### c. Markulin's appeal

In lieu of a formal brief, Markulin wrote a letter to this Court, asking for reconsideration in light of the fact that medication she is on makes her "foggy headed or sleepy" and "keeps [her] in the bathroom." (Dkt. No. 13) Markulin's current prescription drug side-effects do not bear on whether she was disabled during the period of August 1, 2007 through June 30, 2009 or undermine the Commissioner's decision. I will nevertheless construe her request for reconsideration as a contention that the Commissioner's decision is not supported by substantial evidence, or is otherwise erroneous. I find, however, that the ALJ's findings do not contain any errors of law or procedure, and are supported by substantial evidence.

### d. Analysis

Because the ALJ found in Markulin's favor at steps 1, 2 and 4, I will focus the analysis on the step 3 medical equivalence analysis, the ALJ's RFC evaluation, and step 5.

#### i. ALJ's step three analysis

Markulin argues that the ALJ erred in finding that her severe impairments, alone or in combination, did not meet or medically equal a Listing set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. The claimant bears the burden of proving that her impairments, whether individually or collectively, equal or meet those listed in Appendix 1. However, "if a claimant's impairment does not match one listed in Appendix 1, the ALJ is required to perform a comparison between the claimant's impairment(s) and those listed in Appendix 1." *Torres v. Comm'r of Soc. Sec.*, 279 F. App'x 149, 151–52 (3d Cir. 2008); *see also* 20 C.F.R. § 404.1526(b). The Third Circuit has stated that step three requires the ALJ to perform "an analysis of whether and why [the claimant's individual impairments], or those impairments combined, are or are not

equivalent in severity to one of the listed impairments." *Burnett*, 220 F.3d at 119. The ALJ is "not require[d]...to use particular language or adhere to a particular format in conducting [her] analysis"; rather, there must be "a sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505.

ALJ Friedman considered Listing 5.05 relating to chronic liver disease. As set forth in the ALJ's decision, to meet or medically equal Listing 5.05, a claimant must demonstrate one of seven specified criteria, none of which the ALJ found to be satisfied. (R. 26) The seven criteria are as follows:

- (a) Hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, demonstrated by medically acceptable imaging, resulting in hemodynamic instabilities as defined by 5.00D5, and requiring hospitalization for transfusion of at least 2 units of blood;
- (b) Ascites or hydrothorax not attributable to other causes, despite continuing treatment, present on at least two evaluations at least 60 days apart within a six-month period, documented by (i) paracentesis or thoracentesis or (ii) medically acceptable imaging or physical examination and either a serum albumim level of 3.0 g/dL or less or INR level of at least 1.5;
- (c) Spontaneous bacterial peritonitis with peritoneal fluid containing an absolute neutrophil count of at least 250 cells/mm3;
- (d) Hepatorenal syndrome with serum creatinine elevation of at least 2 mg/dL, oliguria with 24-hour urine output less than 500 mL, or sodium retention with urine sodium less than 10 mEq per liter;
- (e) Hepatopulmonary syndrome with (i) arterial oxygenation or (ii) documentation of intrapulmonary arteriovenous shunting by contrast-enhanced echocardiography or macroaggregated albumin lung perfusion scan;

    (f) Hepatic encephalopathy and documentation of abnormal behavior, cognitive dysfunction, changes in mental status or altered state of consciousness present on at least two evaluations at least 60 days apart within 6 months, and either (i) history of surgical portosystemic shunt or (ii) asterixis or other fluctuating physical neurological abnormalities, electroencephalogram demonstrating triphasic slow wave activity, serum albumin of 3.0 g/dL or less, or INR of 1.5 or greater; or

(g) End stage liver disease with SSA CLD scores of 22 or greater.

Having performed a review of the medical records and the testimony of Dr. Fechner, ALJ Friedman found that none of the criteria for Listing 5.05 were met. There is sufficient evidence in the record to support this finding.

With respect to the paragraph A criteria, the medical record reflects that Markulin had "suspect[ed] gastric and esophageal varices" on August 21, 2007 (R. 329), "Grade A" esophageal varices were found on March 10, 2008 (R. 473), rectal varices were noted on October 14, 2010 (R. 350), and esophageal varices without bleeding were present on January 20, 2011 (R. 370). However, the record contains no evidence of hemorrhaging from these varices or from portal hypertensive gastropathy, as required to satisfy paragraph A.

With respect to paragraph B criteria, the medical evidence indicates that Markulin suffered from ascites on November 8, 2007. (R. 328 ("A large amount of ascites is seen in the abdomen and pelvis."); R. 381 ("ascites present" in abdomen); R. 387 ("massive ascites")) The records also indicate that Markulin underwent paracentesis in November 2007. (R. 378) However, November 2007 is the only time the records reflect that Markulin had ascites, and thus the criteria of two occurrences of ascites within a six month period is not met. Indeed, the medical records from after November 2007 note "no ascites." (R. 261 (July 6, 2009), 327 (February 17, 2010)) Furthermore, Markulin's albumin and INR levels do not meet the thresholds of Listing 5.05. The medical records demonstrate that Markulin's albumin levels were never below 4.1. On one

occasion in 2007, her tests showed an INR level of 1.8. However, there were no other times where Markulin's readings were above the 1.5 threshold.

As to paragraphs A and B, then, substantial medical evidence supports the ALJ's negative finding. As to paragraphs C through G, the medical records do not contain any evidence at all. Thus, I find that ALJ Friedman's finding that Markulin's impairments did not meet or medically equal Listing 5.05 was supported by substantial evidence.

With respect to Markulin's complaints of dizziness, the medical records reflect that in May 2008, she "nearly passed out" in Dr. Skrzypczak's office and was taken to the emergency room. She was given saline and her condition improved. Medical records note that during her hospital stay she complained of dizziness and weakness. (R. 469, 472) Markulin was also admitted to the hospital on August 20, 2009, for "episodes of syncope" (temporary loss of consciousness caused by a fall in blood pressure), likely caused by low levels of potassium, but the records note that during her hospital stay, Markulin experienced no further episodes of syncope, light-headedness or dizziness. (R. 461) At the hearing, Markulin testified that her water pills make her pass out or get dizzy. (R. 119-20, 122) When pressed, she explained that she passed out "every once in a while" but that she "get[s] dizzy all the time." (R. 120, 136) As of the date of the hearing, November 22, 2012, the last time Markulin had passed out was in March of 2012. (R. 120) Markulin further testified that she spends her day cleaning, doing yardwork, cooking, and doing jigsaw puzzles. (R. 126) She explained that picking items off the floor is difficult for her as she gets dizzy so she needs to stand up slowly. (R. 126) Markulin also stated that she is "not allowed out by myself...[my husband]'s afraid that I might pass out." (R. 127) In her Function Report dated March 7, 2010, Markulin noted "no problems with personal care," that she cooks an hour each day, cleans for over an hour including vacuuming, dusting and doing laundry, and takes care of her pets. (R. 235-36) On the other hand, she wrote that she has to "try not to move around so much so I don't get dizzy and fall" and that she has "to be

careful so I don't get dizzy when I do anything." (R. 234, 239) With respect to dizziness, Dr. Fechner testified:

> I just don't see it in the chart. I'm sure there's been episodes, but I don't see ER visits, hospitalization, anything where it's been really severe. It is true that Lasix and Aldactone are water pills and sometimes if one gets up too quickly there can be problems with dizziness. That would be reflected in the residual functional capacity, Your Honor. That's it.

(R. 142)

The ALJ properly considered and balanced all of the foregoing evidence. (R. 27) Although ALJ Friedman does not mention dizziness specifically at step three, an ALJ is not required to repetitively analyze each symptom at each step; the requirement is that the decision be subject to "meaningful review" by a reviewing court. *See Wilkinson v. Colvin*, 2014 WL 1316056, at *8 (D.N.J. Apr. 1, 2014 (finding no error in step three where ALJ failed to mention dizziness and other symptoms) (citing *Jones*, 364 F.2d at 505). I am satisfied from the decision as a whole that the ALJ had in mind the evidence as to dizziness and considered it adequately.

In sum, assessing the record as a whole, I find that ALJ Friedman, at step three, properly considered Markulin's impairments alone and in combination to determine if her impairments met or medically equaled the Listings.

### *ii. ALJ's RFC evaluation*

RFC is an assessment of the most a claimant can do despite her impairments. *See* 20 C.F.R. §404.1545. To determine a claimant's RFC, an ALJ must engage in a two-step process: first, consider all of a claimant's symptoms which can reasonably be accepted as consistent with the objective medical evidence, and second, determine how those symptoms affect the claimant's ability to work. 20 C.F.R. §404.1529. Here, ALJ Friedman determined that Markulin had the residual functional capacity to "perform the full range of

sedentary work as defined in 20 C.F.R. 404.1567(a)." (R. 26) I find that the ALJ sufficiently analyzed the evidence in the record and explained his RFC findings, which are supported by substantial evidence.

In determining the claimant's RFC, the ALJ considered Markulin's testimony, the testimony of Dr. Fechner, the reports of Drs. Skrzypczak and Duhl, and the medical record as a whole. (R. 26-30)

ALJ Friedman found that Markulin was told in August of 2007 that her liver was "bad" and that she thereafter stopped drinking. (R. 27) ALJ Friedman also found that Markulin engaged in "limited daily activities," at least in part because of her dizzy spells. (R. 27) Markulin testified that she would "love to go to work" but is told not to by her doctor because when she takes her prescriptions, she "pass[es] out." (R. 119-20) Yet Markulin also testified that the last time she passed out was seven months before the hearing, a point the ALJ emphasized in his decision. (R. 27, 120) Furthermore, although she complained at the hearing of being dizzy "all the time" (R. 120) and noted on her function sheet that she has to sit most of the day to avoid getting dizzy and passing out (R. 234), Markulin spends hours a day cooking, cleaning, doing yardwork and taking care of herself, her home and her pets. (R. 126, 235-36) While she does complain of getting dizzy when she moves or gets up too fast, such episodes do not seem to last very long and, as Dr. Fechner noted, can be avoided by moving more slowly and carefully. (R. 136, 152) As to physical activities, Markulin testified that she has no physical limitations preventing her from sitting, that she can stand for thirty minutes before her feet start to bother her, and that she has no limitations on how far or long she can walk provided she is not too tired. (R. 127-29)

ALJ Friedman relied on Dr. Fechner's testimony that Markulin's liver was stable, her cirrhosis was mild, and that the record was devoid of treatments for dizziness. (R. 27) Dr. Fechner testified that the liver was the "only thing ... of any import" in Markulin's medical records. (R. 140) Although Markulin suffers from a cirrhotic liver, Dr. Fechner stated that cirrhosis "can stay stable for

11

long, long periods of time" when the patient stops drinking, which Markulin has done. (R. 140-41) Dr. Fechner also made note of Markulin's albumin, bilirubin, enzyme and INR levels, stating that, as of May 2009, her albumin and bilirubin levels were normal, her enzyme levels were very good, and that while her INR reading was "a little bit elevated" at 1.4, that reading was an improvement upon her INR of 1.8 in 2007. (R. 141)

With regard to the complaint of dizziness, Dr. Fechner testified that Markulin "could do a full range of sedentary activity at this point" but that because of her occasional dizziness, she should not be "up on scaffolding or ladders, exposed areas" and that she should not be "near heavy, dangerous machinery." (R. 143) When asked about postural limitations, Dr. Fechner said that as to stooping and bending, Markulin had no limitations (although he later clarified that those activities should be undertaken "carefully and occasionally"), and that crouching should be only occasional. (R. 143, 152)

ALJ Friedman also took note of the reports of Dr. Skrzypczak, who had opined that Markulin could only stand for 15 minutes, but not during a workday, could not lift 5 pounds and had a very limited RFC as a result of a number of conditions. (R. 28-9) Dr. Fechner testified that he disagreed with Dr. Skrzypczak's reports because Markulin's cirrhosis was stable, her ascites had occurred only once (in 2007), and the medical record contained no support for Dr. Skryzpczak's other diagnoses. (R. 28) ALJ Friedman was persuaded by Dr. Fechner's analysis. He afforded Dr, Skrzypczak's report little weight because the reports were dated in 2011, well after the last date insured, the diagnoses were contradicted by the other medical evidence, and Dr. Skrzypczak's recommended RFC was not supported by the evidence. (R. 29)

Finally, ALJ Friedman considered Dr. Duhl's report, but noted that the report was devoid of complaints or treatments for dizziness and that it indicated that the examinations were normal. (R. 29)

12

In sum, the record as a whole supports the ALJ's conclusion as to Markulin's RFC and adequately explains how ALJ Friedman made his determination. The RFC is thus supported by substantial evidence.

### iii. ALJ's step five analysis

ALJ Friedman determined that Markulin, given her age, education, work experience and RFC, was able to perform all or substantially all of the exertional demands at a sedentary exertional level, and that Medical-Vocational Rule 201.21 therefore directed a finding that Markulin was not disabled. (R. 30)

At step five, the Commissioner bears the burden on showing that the claimant can perform work which exists in the national economy, in light of her age, education, work experience and RFC. 20 C.F.R. § 404.1520(a)(4)(v). The analysis may depend on whether the claimant has only exertional limitations, or has non-exertional limitations. Exertional limitations are impairment-caused limitations that affect a claimant's ability to meet the strength demands of a job: sitting, standing, walking, lifting, carrying, pushing, and pulling. See 20 C.F.R. § 404.1569a; SSR 96-9p, 1996 WL 374185 (Jul. 2, 1996). Non-exertional limitations are impairment-caused limitations that affect a claimant's ability to meet the other demands of a job, including mental capabilities; vision and hearing; postural functions such as climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering and feeling; and environmental restrictions. See 20 C.F.R. § 404.1569(a)(c)(1)(i-vi); SSR 96-9p.

Where a claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Rules to determine whether such work exists. The Medical-Vocational Rules set forth tables with various combinations of age, education, work experience and RFC, and direct a finding of disabled or not disabled for each combination. See 20 C.F.R. Part 404, Subpt. P, App'x 2. "When the four factors in a claimant's case correspond exactly with the four factors set forth in the grids, the ALJ must reach the results the grids reach."

*Sykes v. Apfel*, 288 F.3d 259, 263 (3d Cir. 2000). However, this applies only to exertional limitations; where the claimant has significant non-exertional limitations, the grids provide only a framework, and the ALJ must consider additional evidence to determine whether there are jobs in the national economy that someone with the claimant's combination of impairments could perform. *Id.* at 270.

Where a claimant has non-exertional impairments, an ALJ is permitted to rely on Social Security Rulings ("SSR") as the additional evidence required under *Sykes v. Apfel*; such SSRs may be a permissible substitute for the testimony of a vocational expert. *See Allen v. Barnhart*, 417 F.3d 396, 406 (3d Cir. 2005) ("While, surely, the Agency can use its rules as a substitute for individualized determination, nonetheless, there must be a "fit" between the facts of a given case, namely, the specific non-exertional impairments, and the way in which the Rule dictates that such non-exertional limitations impact the base."). Reliance on an SSR is appropriate where "'it is crystal-clear that the SSR is probative as to the way in which the non-exertional limitations impact the ability to work, and thus, the occupational base.'" *Burrows v. Comm'r of Soc. Sec.*, 2014 WL 2919469, at *4 (D.N.J. June 27, 2014) (quoting *Allen*, 417 F.3d at 406). Under such circumstances, an ALJ need not resort to a vocational expert and may instead rely upon an SSR, so long as the "ALJ's own reference to the SSR ruling discuss[es] specifically the limitations presented by the medical record." *Allen*, 417 F.3d at 407; *see also Lamanna v. Comm'r of Soc. Sec.*, 116 F. App'x 354, 357 (3d Cir. 2004) (requiring ALJ to set forth the portions of the SSR(s) relied upon in order to permit meaningful review).

Here, the ALJ found that Markulin was forty-six years old on the last date insured, which made her a "younger individual," and that she had at least a high school education. (R. 30) Given these vocational factors, and the RFC finding that Markulin could perform "the full range of sedentary work," Medical-Vocational Rule 201.21, as ALJ Friedman notes, directs a finding of "not disabled" regardless of transferability of job skills. (*Id.*; *see also* 20 C.F.R.

Part 404, Subpt. P, App'x 1) Although the RFC finding of ALJ Friedman does not contain non-exertional limitations, at step five the ALJ's analysis nevertheless addressed certain non-exertional limitations set forth by Dr. Fechner's testimony (discussed above). The ALJ determined that those non-exertional limitations did not significantly erode the occupation base for sedentary work, relying on a number of Social Security Rulings. The SSRs on which ALJ Friedman relied relate specifically to the non-exertional limitations cited by Dr. Fechner and conclude, as the ALJ noted, that the sedentary occupational base is not eroded.

For instance, SSR 96-9p states that "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." 1996 WL 374185 at *7. SSR 85-15, also relied on by ALJ Friedman, notes that "if a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985). Crawling and kneeling, according to the SSR, is rare in even arduous work so a limitation in crawling or kneeling "would be of little significant in the broad world of work," including sedentary work. *Id.* Similarly, SSR 83-14 explains that "[r]elatively few jobs in the national economy require ascending or descending ladders and scaffolding." SSR 83-14, 1983 WL 31254, at *2 (Jan. 1, 1983). Crouching is not necessary in sedentary work and stooping is required only occasionally, and thus a person with limitations in those areas can still "perform substantially all of the exertional requirements of most sedentary" jobs. *Id.*

Thus, ALJ Friedman appropriately used the Medical-Vocational Guidelines as a framework and relied upon specific portions of SSRs that clearly relate to the ways in which the non-exertional limitations experienced by Markulin affect the occupational base for sedentary work. ALJ Friedman's

finding that there are significant numbers of jobs in the national economy that Markulin could perform is thus supported by substantial evidence.

### III.    CONCLUSION

For the foregoing reasons, the ALJ's decision is **AFFIRMED**. An appropriate order accompanies this Opinion.

Dated: October 15, 2015

_____
**KEVIN MCNULTY**
**United States District Judge**